UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DERMY L. URENA,                                     :

               Plaintiff,                   :         <u>OPINION AND ORDER</u>

       -v.-                                       :         17 Civ. 10077 (GWG)

                                   :

COMMISSIONER OF SOCIAL SECURITY,           :

                                   :

             Defendant.                  :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

<u>Pro se</u> plaintiff Dermy Urena seeks review of the Commissioner of Social Security's

denial of her application for disability insurance benefits and supplement social security

insurance. The Commissioner now moves for judgment on the pleadings.[1] For the reasons

stated below, the Commissioner's motion is granted.

I. <u>BACKGROUND</u>

    A.  <u>Ms. Urena's Claim for Benefits and Procedural History</u>

    Ms. Urena first applied for disability insurance benefits on June 6, 2012, <u>see</u> Certified

Administrative Record, filed June, 8, 2018 (Docket # 9) ("R."), at 48, and for supplemental

security income on June 28, 2012, see R. 49, 96-111. Her applications listed a disability onset

date of August 31, 2010. See R. 96, 105.

    The Social Security Administration denied her applications on August 29, 2012. R. 52.

Ms. Urena requested a hearing before an administrative law judge ("ALJ"), which occurred on

---

[1] <u>See</u> Notice of Motion, filed June 8, 2018 (Docket # 10); Memorandum of Law in
Support of Defendant's Motion for Judgment on the Pleadings, filed June 8, 2018 (Docket # 11)
("Def. Mem."); Declaration of Dermy. L Urena, filed Sept. 12, 2018 (Docket # 16) ("Pl. Decl.");
Reply Memorandum of Law in Further Support of Defendant's Motion for Judgment on the
Pleadings, filed Oct. 2, 2018 (Docket # 17) ("Def. Reply").

August 8, 2013.  R. 68-69; <u>see</u> R. 22-47.  She was not represented by an attorney at the hearing.

R. 24.  In a written decision dated January 7, 2014, the ALJ denied Ms. Urena's application.  R.

8-18.  Ms. Urena requested a review of the ALJ's decision by the Appeals Council.  R. 5-7.  The

Appeals Council denied this request on March 24, 2015.  R. 1-4.  Ms. Urena commenced a civil

action in federal district court on May 1, 2015, and timely filed her complaint on that date <u>pro</u> <u>se</u>.

<u>See</u> R. 385-88.  On January 11, 2016, the district court remanded the case pursuant to the parties'

stipulation.  R. 397-99.  On February 23, 2016, the Appeals Council vacated the ALJ's January

7, 2014, decision, giving specific instructions to the ALJ to evaluate certain medical opinions,

develop the record, evaluate the claimant's impairments and residual functional capacity, and

obtain vocational expert testimony.  <u>See</u> R. 400-04.

On remand, a new hearing was held before a different ALJ on October 11, 2016.  R. 345-

66.  On March 7, 2017, the ALJ issued a decision finding that Ms. Urena was not disabled.  R.

325-38.  On October 18, 2017, the Appeals Council denied review.  R. 319-24.  On December

22, 2017,  Ms. Urena commenced this action.  <u>See</u> Complaint, filed Dec. 22, 2017 (Docket # 2).

### B.  The Administrative Record and Medical Evidence

The Commissioner has provided a summary of the medical evidence contained in the

administrative record.  <u>See</u> Def. Mem. at 4-14.  Plaintiff's submission does not object to the

Commissioner's summary of the evidence.  <u>See</u> Pl. Decl.  Having examined the record, we adopt

the Commissioner's summary as accurate and complete for the purposes of the issues raised in

this suit.  We discuss all the medical evidence pertinent to the adjudication of this case in section

III below.

### C.  The March 7, 2017, Hearing Before the ALJ

Ms. Urena was not represented at the hearing held on October 11, 2016.  R. 347.  At the

2

start of the hearing, the ALJ explained that she developed the medical record by sending Ms. Urena for an examination, and by requesting hospital records from Montefiore Medical Center. R. 348-49. The ALJ stated that she had not yet received psychiatric records from Montefiore but that she would keep the record open and send a follow-up request to obtain a complete record. R. 349.

Ms. Urena testified that she was born on December 14, 1968, and was 47 years old at the time of the hearing. R. 351. She was single and lived with her child, who was 14 years of age. R. 351-52. Her highest level of education was "some college." R. 352. The onset date of Ms. Urena's alleged disability was August 31, 2010. R. 351. During the hearing, Ms. Urena alleged that she experiences anxiety and panic attacks in noisy environments, R. 354-55, and in crowds, see R. 356; that she experiences depression that causes her to "not want[] to do anything," R. 359; and that she struggles with fear that she might "blackout and hurt someone," which causes her to shake and sometimes prevents her from leaving her house, see R. 360, 364.

During the hearing, Ms. Urena stated that she had worked since August 31, 2010, the alleged onset date of her disability. R. 352-55. She testified that she performed housekeeping work in the home of a person she knew on a sporadic basis, approximately two or three times per week, in 2010, 2012, 2013, and 2015. R. 352-53, 360-61. Ms. Urena stated that she was able to perform this work despite her anxiety because her employer "always gave [her] . . . privacy" and left her alone in the house while she worked, and Ms. Urena would complete her work before anyone came home. R. 360-61. Ms. Urena also testified that she took a course and obtained a certificate in tax preparation from September 2015 through January 2016. R. 353. She subsequently worked as a tax preparer, but explained that her hours were cut after she "got sick . . . a couple of times" while at work. R. 354. After her hours were cut to three days per

week, and then to two days per week, she was let go in late March 2016. See R. 353-55. Ms. Urena testified that it was difficult for her to work in the office as a tax preparer when there was noise, but that "if it's quiet [she could] manage for a while, but then it bec[omes] . . . overwhelming." R. 354-55.[2] Once she becomes overwhelmed, Ms. Urena stated that she "get[s] anxiety and panic attacks," which she said would scare her coworkers. See R. 354-55. Ms. Urena also stated that her fears of blacking out and hurting someone have caused her to be afraid to leave the house, and to call into work to say that she cannot go. R. 364.

Ms. Urena testified that in a typical day, she would attend appointments, talk with her son, prepare his dinner, and watch television. R. 355. She stated that she does her laundry at home, and goes food shopping with a friend. R. 356. She testified that she does not go food shopping alone because "it's too crowded," and she does not like being in crowds. R. 356. For transportation, Ms. Urena testified that she takes taxis when she can afford it but will take buses when she cannot. R. 356. She testified that she leaves extra time to wait for an empty bus to arrive when she is traveling, and will not take trains because they are too crowded. R. 356-57. She testified that she sews to pass the time, R. 358, and that she is involved with her son's activities, but has to "force" herself to be involved because she will not allow him to see her in a depressed state, R. 359-60.

Ms. Urena testified that she takes Zoloft, Lamictal, Atarax, and Topamax, for her anxiety, R. 357, and attends therapy twice a month at Montefiore Medical Center, R. 357-58.

---

[2] Though not raised during the hearing, the record indicates that prior to August 31, 2010, the date on which Ms. Urena alleged she became disabled, Ms. Urena was self-employed in child care, and worked as an office manager, in sales, and as a nail technician. See R. 122, 133, 143. However, during her August 8, 2013, hearing before an administrative law judge, Ms. Urena denied ever working in child care. See R. 428.

She sees a psychiatrist every two months for medication refills.  R. 358.  Ms. Urena states that she does not sleep well, and at the time of the hearing could sleep straight for three hours due to drowsiness being a side effect of one of her medications.  R. 358-59.

A vocational expert testified during Ms. Urena's hearing by telephone.  See R. 361.  The ALJ asked the vocational expert hypothetical questions about an individual of Ms. Urena's age and with her educational background, and asked the vocational expert to assume that the hypothetical individual "is capable of performing simple routine tasks– . . . one to two-step tasks at all exertional levels," and that the hypothetical individual could "have occasional contact with co-workers and supervisors but no direct work-related contact with the public."  R. 362.  Further, the ALJ instructed the vocational expert to assume that the individual could "work around others but not on teams or in collaboration with others," and could "make simple decisions and adapt to occasional changes in essential work tasks."  R. 362.  The vocational expert opined that such an individual could performs the jobs of cleaner, of which there were 100,000 jobs in the national economy; mail clerk, of which there were 120,000 jobs in the national economy; and document preparer, of which there were 80,000 jobs in the national economy.  R. 362.  The ALJ then asked the vocational expert to further assume that "the individual would miss two or more days of work per month on a regular and recurring basis because of anxiety."  R. 362-63.  In that case, the vocational expert concluded that "there would be no jobs for this individual."  R. 363.

D.  The ALJ's Decision

The ALJ concluded that Ms. Urena was not disabled, as defined in the Social Security Act, from August 31, 2010, through the date of the decision.  R. 337.  The ALJ found that Ms. Urena met the insured status requirements of the Social Security Act through December 31, 2013, R. 330, and that while she had worked since August 31, 2010, her post-alleged onset date

earnings did not meet the applicable substantial gainful activity threshold, R. 331. Accordingly, the ALJ concluded that Ms. Urena had not engaged in substantial gainful activity since the alleged onset date. R. 331. The ALJ next found that Ms. Urena had the following severe impairments: 1) adjustment disorder with anxiety; 2) bipolar disorder; 3) panic disorder; 4) anxiety disorder, not otherwise specified; and 5) substance abuse disorder, in sustained full remission. R. 331. Upon reviewing several physical conditions reflected in the record, the ALJ concluded that none of these caused more than minimal functional limitations. R. 331. In reaching this decision, the ALJ noted that Ms. Urena did not allege disabling physical impairments. See R. 331.

The ALJ next considered the severity of Ms. Urena's mental impairments, singly and in combination, in order to determine whether Ms. Urena had an impairment listed in Appendix 1 of the regulations. See R. 331-33. In reaching her conclusion, the ALJ considered whether Ms. Urena's severe mental impairments met the "paragraph B" criteria of Listing 12.04, depressive, bipolar and related disorders; or Listing 12.06, anxiety and obsessive-compulsive disorders.[3] R. 331-33; see 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A). To meet those criteria, a claimant must show that the mental impairments result in at least one extreme or two marked limitations[4]

_____

[3] At the time of Ms. Urena's hearing on October 11, 2016, an older version of the rules regarding the evaluation of medical evidence were in effect. See Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,138 (Sept. 26, 2016) (to be codified at 20 C.F.R. pt. 404). The old regulations gave different titles to listings 12.04 and 12.06. See 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00 (2016). The new regulations went into effect on January 1, 2017, id., and apply to "claims that [were] pending on or after the effective date," id. Because the decision in Ms. Urena's case was issued in March 2017, and was denied by the Appeals Council in October 2017, the new rules apply.

[4] A "marked" limitation means that the applicant's "functioning in [an] area independently, appropriately, effectively, and on a sustained basis is seriously limited." § 12.00(F)(2)(d). An "extreme" limitation means that the applicant is "not able to function in

in each of four broad areas of functioning, which are "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt and manage oneself."[5] Id. § 12.00(A)(2)(b); see R. 331-32. The ALJ concluded that the impairments resulted in no limitations on Ms. Urena's ability to understand, remember, or apply information, R. 332; moderate limitations on Ms. Urena's ability to interact with others,[6] R. 332; moderate limitations on Ms. Urena's ability to concentrate, persist, or maintain pace, R. 332; and moderate limitations on Ms. Urena's ability to manage herself, R. 332-33. In reaching these conclusions, the ALJ explicitly considered Ms. Urena's hearing testimony, progress notes from Ms. Urena's treating physicians at Montefiore Medical Center, and reports from state agency consultative examinations. R. 332-33. The ALJ further concluded that the evidence failed to establish the presence of "paragraph C" criteria, R. 333, indicating a "serious and persistent mental disorder[]." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A)(2)(c). Accordingly, the ALJ concluded that Ms. Urena did not have an impairment that meets or medically equals one of the impairments listed in the Appendix. See R. 331-33.

The ALJ next assessed Ms. Urena's residual functional capacity ("RFC"). R. 333-36.

---

[an] area independently, appropriately, effectively, and on a sustained basis." § 12.00(F)(2)(e).

    [5] Listings 12.04 and 12.06 each contain three paragraphs, designated A, B, and C. § 12.00(A)(2). Paragraph A of each listing "includes the medical criteria that must be present in [an applicant's] medical evidence." § 12.00(A)(2)(a). Paragraph B provides the functional criteria assessed. § 12.00(A)(2)(b). Paragraph C of each listing provides the criteria used to evaluate "serious and persistent mental disorders." § 12.00(A)(2)(c) (internal punctuation omitted). Under listings 12.04 and 12.06, an applicant's "mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." § 12.00(A)(2).

    [6] A "moderate" limitation means that the applicant's "functioning in [an] area independently, appropriately, effectively, and on a sustained basis is fair." § 12.00(F)(2)(c).

The ALJ concluded that Ms. Urena had the RFC to perform less than the full range of work at all exertional levels. R. 333. Specifically, the ALJ found that: 1) Ms. Urena can perform simple, routine, one to two step tasks; 2) that she can tolerate occasional contact with coworkers and supervisors, but no direct work-related contact with the public; 3) that she can work around others, but not on teams or in collaboration with others; and 4) that she can make simple decisions and adapt to occasional changes in essential work tasks. R. 333. In reaching these conclusions, the ALJ found that while Ms. Urena's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . ., [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 334.

The ALJ noted that she gave "limited weight to the assessments" of two treating sources, Dr. G. Blass and Ms. Beverly Punter-Knox, because their opinions were "conclusory" and were at odds with other evidence in the record. See R. 335. The ALJ gave more weight to the evaluations of Drs. Michael Kushner, Ruby Phillips, and Joseph G. Vitolo because they were "generally consistent with the medical evidence." R. 335. The ALJ concluded by finding that, based on the vocational expert's testimony, Ms. Urena was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" accounting for her "age, education, work experience, and residual functional capacity." R. 337. Accordingly, the ALJ concluded that Ms. Urena was not disabled. R. 337.

II. GOVERNING STANDARDS OF LAW

    A. Scope of Judicial Review under 42 U.S.C. § 405(g)

    A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp.

2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing

court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134

F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v.

Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

     B.  Standard Governing Evaluations of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam).

Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see

also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must

determine whether the claimant is currently engaged in any "substantial gainful activity." 20

C.F.R. § 404.1520(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity,

the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC permits the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

C. The "Treating Physician" Rule

In general, the ALJ must give "more weight to medical opinions" from a claimant's treating sources when determining if the claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must generally give "a measure of deference to the medical opinion of a claimant's treating physician"). Treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments but only if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); accord Selian, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citations omitted). Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted).

If the ALJ does not give controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand. See Greek, 802 F.3d at 375 (quoting Burgess, 537 F.3d at 129-30). When assessing how much weight to give the treating source's opinion, the ALJ should consider the factors set forth in the Commissioner's regulations, which are (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(2)-(6)). The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good

reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-76. However, a "slavish recitation of each and every factor" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear." Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013).

D. Credibility Determinations

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales, 402 U.S. at 399; McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980); and Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (summarizing and citing with approval a holding in Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)). Nonetheless, when discounting a claimant's credibility regarding her residual functional capacity, regulations impose some burden on the ALJ to explain her decision. As the Second Circuit has stated:

> When determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49.

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643); see also Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999). The ALJ must make this determination "in light of medical findings and other evidence[] regarding the true extent of the pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (internal quotation marks omitted) (quoting McLaughlin, 612 F.2d at 705). However, where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal." Selian, 708 F.3d at 420 (citing Calabrese v. Astrue, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order)). Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, . . . the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

III.  DISCUSSION

We assume Ms. Urena to be arguing that the ALJ's decision was not supported by substantial evidence.

A.  The ALJ Properly Concluded that Ms. Urena Does Not Have a Severe Physical Impairment

In her decision, the ALJ notes that the record shows that Ms. Urena has diagnoses of hypertension, hypothyroidism/Grave's disease, a history of left 5th finger tendon injury, daily headaches as of April 2015, and knee pain in November and December 2014. R. 331. The ALJ

concluded Ms. Urena's hypertension, hypothyroidism, history of left 5th finger tendon injury, and headaches did not cause more than minimal functional limitations. R. 331. The ALJ concluded that Ms. Urena's knee pain was "not medically determinable." R. 331. The ALJ pointed to substantial evidence to justify each conclusion regarding each potential physical impairment. With respect to the diagnoses of hypertension and hypothyroidism/Grave's disease, the ALJ noted that Ms. Urena "received only conservative care to address these conditions." R. 331. Indeed, Ms. Urena's medical records show that this condition is managed with medication. See R. 510, 514 (Montefiore record from June 2015 noting that Ms. Urena takes synthroid for hypothyroidism and is "[a]symptomatic"). Based on information contained in Ms. Urena's records from Lincoln Medical Center and Montefiore Hospital, the ALJ concluded that Ms. Urena's left 5th finger tendon injury and daily headaches did not last the required 12 months or longer. R. 331. This conclusion is supported by Ms. Urena's hospital records. See R. 149-99 (documenting finger injury and healing progress); id. 565-67 (documenting headaches). With respect to Ms. Urena's knee pain, the ALJ noted that "the record is absent an associated diagnosis" and that "an April 2014 knee x-ray was unremarkable." R. 331. The ALJ did not address Dr. Gino Zunino's report that Ms. Urena had knee pain that affected her ability to work and required exertional limitations. See R. 331; see also R. 264 (noting that Ms. Urena reported to Dr. Zunino that she "is not physically . . . able to work at this time" in part because she experiences "pains to both knees"). However, "[a]n ALJ does not have to state on the record every reason justifying a decision." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012). Here, the ALJ's failure to explicitly discuss Dr. Zunino's opinion does not require remand because Ms. Urena did not even allege that she suffered from a physical limitation, see R. 40, and this conclusion is supported by Dr. Zunino's own conclusion that Ms. Urena suffers

from "[m]ild right knee crepitance," and a "slight decrease" in her range of motion.  See R. 273.

Accordingly, substantial evidence supports the conclusion that Ms. Urena does not suffer from a

severe physical impairment.

   B.  The ALJ Properly Applied the "Special Technique" for Evaluating Mental
   Impairments

   When evaluating the severity of a claimant's mental impairments, the Commissioner

requires the use and documentation of a "special technique" provided in 20 C.F.R. § 404.1520a.

This technique requires, first, that the ALJ evaluate the claimant's "pertinent symptoms, signs,

and laboratory findings to determine whether [he or she has] a medically determinable mental

impairment(s)."  20 C.F.R. § 404.1520a(b)(1).  If the claimant is determined to have such

impairments, the ALJ must "specify the symptoms, signs, and laboratory findings that

substantiate the presence of the impairment(s) and document [his or her] findings."  Id.  Next,

the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four

broad areas:[7] "[u]nderstand, remember, or apply information; interact with others; concentrate,

persist, or maintain pace; and adapt or manage onself."[8]  Id. §§ 404.1620a(b)(2), (c)(2)-(3);

---

   [7]  "These four broad functional areas are also contained in the 'paragraph B' criteria for
several listed impairments, see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00."  Vargas v.
Berryhill, 2017 WL 2274240, at *2 (W.D.N.Y. May 25, 2017).  In other words, "[t]he evaluation
of a claimant's limitations in the four functional areas is used to determine whether plaintiff's
mental impairment is 'severe' as well as whether the claimant's impairment meets the criteria for
a Listed Impairment under step three of the disability analysis.  20 C.F.R. § 404.1520a(c)(3)
. . . ."  Johnson v. Comm'r of Soc. Sec., 2017 WL 120938, at *9 n.15 (N.D.N.Y. Jan. 11, 2017).

   [8]  As noted in footnote 3, at the time of Ms. Urena's hearing on October 11, 2016, an
older version of the rules regarding the evaluation of medical evidence were in effect.
See Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,138
(Sept. 26, 2016) (to be codified at 20 C.F.R. pt. 404).  The formulation of the four broad
categories was somewhat different under the old version of the rules.  See 20 C.F.R. § 404.1520a
(2016).  The new regulations went into effect on January 1, 2017, id., and apply to "claims that
[were] pending on or after the effective date."  Id.  Because the decision in Ms. Urena's case was

16

accord Kohler v. Astrue, 546 F.3d 260, 266 (2d Cir. 2008) (describing this process under an older version of the regulations). "[T]he regulations require application of this process to be documented." Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520(e)). Specifically, the ALJ's written decision "must include a specific finding as to the degree of limitation in each of the functional areas" listed above. 20 C.F.R. § 404.1520a(e)(4). Where the reviewing court cannot identify the ALJ's findings regarding the degree of the claimant's limitations in the four functional areas, or discern whether the ALJ properly considered all relevant evidence to those areas, remand is appropriate. See Kohler, 546 F.3d at 269; accord Jenkins v. Comm'r of Soc. Sec., 769 F. Supp. 2d 157, 162 (W.D.N.Y. 2011).

Here, the ALJ's decision demonstrates appropriate application of the "special technique." R. 331-33. The ALJ first determined that Ms. Urena had five medically-determinable severe mental impairments: 1) adjustment disorder with anxiety; 2) bipolar disorder; 3) panic disorder; 4) anxiety disorder, not otherwise specified; and 5) substance abuse disorder, in sustained full remission. R. 331. These findings are supported by substantial evidence in the record, which the ALJ pointed to in her decision. See R. 331-332 (citing R. 200-31, 232-365, 492-500). Next, the ALJ properly "rate[d] the degree of functional limitation resulting from the impairments" for each of the four functional areas, as required by the regulations. See Kohler, 546 F.3d at 265-66 (internal punctuation and citation omitted).

With respect to "understanding, remembering, or applying information," the ALJ concluded that Ms. Urena had "no limitations." R. 332. The ALJ properly considered and

issued in March 2017, and was denied by the Appeals Council in October 2017, the new rules apply.

accounted for Ms. Urena's complaints of "recurrent panic symptoms, concentration deficits, and memory deficits." R. 332; see Genier, 606 F.3d at 49 (ALJ required to take claimant's reports into account when determining residual functional capacity). However, the ALJ also noted that "mental status examinations of record did not reveal cognitive abnormalities." R. 332. The ALJ cited two consultative reports conducted by Dr. Kushner on August 17, 2012, R. 232, and Dr. Phillips on April 1, 2016, R. 492-500. Dr. Kushner concluded that Ms. Urena's "ability to maintain attention and concentration may be mildly impaired," R. 235, but also noted that this might be the result of "anxiety in the evaluation," R. 234. He concluded that her recent and remote memory skills were "generally intact," based on memory tests performed. See R. 234. Dr. Kushner further concluded that Ms. Urena could "follow and understand simple directions or instructions" and could "perform simple tasks independently." R. 235. He also noted that Ms. Urena could "maintain a regular schedule[,] . . . learn new tasks[,] . . . perform complex tasks under supervision[, and] . . . make appropriate decisions." R. 235. Dr. Phillips' conclusions were largely the same. See R. 492-500. She concluded that Ms. Urena was "[m]ildly limited in the ability to maintain attention and concentration," "[m]ildly limited in the ability to relate adequately with others," and "[m]oderately limited in the ability to deal appropriately with stress." R. 495. However, Dr. Philips also concluded that Ms. Urena had no limitation in her ability to follow and understand simple directions and instructions, to perform simple tasks independently, to maintain a regular schedule, learn new tasks, to perform complex tasks independently, or to make appropriate decisions. R. 494-95. Further, Dr. Phillips concluded that Ms. Urena's recent and remote memory skills were "[i]ntact," based on tests of her memory functioning. R. 494. The ALJ also cited to Ms. Urena's Montefiore Medical Center records, which consistently indicate that Ms. Urena's thought process was linear, her thought content

unremarkable, her insight and judgment good, and her perception unremarkable.  See R. 200-31.

Finally, the ALJ noted that Ms. Urena acknowledged that she was able to cook, perform

housework, take public buses when not crowded, shop with assistance, and work as a

housekeeper and tax preparer, R. 332, matters that are in fact documented in the record, see R.

352-57.

The ALJ found that Ms. Urena had "moderate limitations" with respect to interacting

with others.  R. 332.  The ALJ considered Ms. Urena's allegations of "panic symptoms triggered

by crowds and loud noise," and noted that "[p]rogress notes reflect complaints of ongoing

anxiety and intermittent findings of depressed/anxious affect."  R. 332.  However, the ALJ also

considered that Ms. Urena "consistently indicated that she socialized with family and maintained

good relationships," that "mental status examinations did not generally reveal behavioral

abnormities [sic]," and that "state agency consultative examinations did not reveal more than

moderate restriction in the claimant's ability to relate adequately with others."  R. 332.  These

findings are supported by the record.  See R. 200-31 (progress notes from Beverly Punter-Knox,

LCSW, consistently indicating a normal mental status exam, and frequently noting that Ms.

Urena has a supportive family);  R. 235 (report of state consultative examiner Dr. Michael

Kushner finding that Ms. Urena's "ability to relate adequately with others . . . may be impaired

by psychological symptoms" but that these symptoms "do not appear to be significant enough to

interfere with the claimant's ability to function on a daily basis"); R. 495 (report of state

consultative examiner Dr. Ruby Phillips, finding Ms. Urena "[m]ildly limited in the ability to

relate adequately with others").  In her submission, Ms. Urena states that due to her anxiety and

panic attacks, she "cannot even enjoy [f]amily gatherings."  Pl. Decl. at 2.  However, this

assertion is consistent with the ALJ's finding, supported by the record, that Ms. Urena in fact has

19

"moderate limitations" with respect to interacting with others. Accordingly, the ALJ's conclusion that Ms. Urena experienced only moderate limitations in her ability to interact with others was supported by substantial evidence.

With respect to "concentrating, persisting, or maintaining pace," the ALJ concluded that Ms. Urena has "moderate limitations." R. 332. The ALJ considered Ms. Urena's complaints of "daily panic symptoms, concentration deficits, and memory deficits," her allegations that "she is sometimes unable to leave the house due to a fear of blacking out and hurting someone," and that she was unable to work in a noisy office environment. R. 332. However, the ALJ gave greater weight to Ms. Urena's acknowledgment of her ability to cook, perform housework, take public buses when not crowded, shop with assistance, and work as a housekeeper and tax preparer, R. 332, which Ms. Urena testified to during the hearing, R. 352-57. The ALJ also correctly noted that "examinations of record did not generally reveal more than mild concentration deficits." R. 332. For example, state agency consultative examiner Dr. Kushner found that Ms. Urena was "[o]nly mildly impaired, possibly due to anxiety in the evaluation" with respect to her attention and concentration. R. 234. State agency consultative examiner Dr. Phillips found that Ms. Urena's attention and concentration were only "[m]ildly impaired due to anxiety." R. 494. Similarly, progress notes from Montefiore Medical Center frequently note that Ms. Urena's concentration and attention span were "intact" or normal. See R. 505, 509, 740. Accordingly, the ALJ's conclusion was supported by substantial evidence.

The ALJ found that Ms. Urena experienced "moderate limitations" with respect to "adapting and managing [herself]." R. 332-33. The ALJ considered that progress notes revealed "some increased symptoms in response to stressors," Ms. Urena's statements that she is "sometimes unable to leave the house due to a fear of blacking out and hurting someone," and

Ms. Urena's statements that she was unable to work when the office was noisy. R. 332-33. However, the ALJ gave greater weight to evidence showing that Ms. Urena was "compliant with treatment and attended scheduled appointments," and had the ability to "cook, perform housework, take public buses when not crowded, and shop with assistance," in addition to working as a housekeeper and tax preparer.[9] R. 333. These conclusions are indeed supported by evidence in the record. See R. 352-57 (testimony that Ms. Urena performed housekeeping work, worked as a tax preparer, does housework, and takes buses when not crowded); R. 235 (report from Dr. Kushner noting that Ms. Urena "groom[s] herself on a daily basis and that she is responsible for cooking, cleaning, laundry, and shopping for her household"); R. 494 (report from Dr. Phillips noting that Ms. Urena "grooms herself, cooks and prepares food [,]. . . does some general cleaning when she has the energy to do so[,] . . . does laundry . . . [and] manages her own money and is able to take public transportation"). Accordingly, the ALJ's determination that Ms. Urena faced only moderate limitations in this area is supported by substantial evidence.

Because Ms. Urena's mental impairments did not result in at least two "marked limitations," or one "extreme" limitation, the ALJ could properly find that the "paragraph B" criteria were not satisfied.[10]

---

[9] In her submission, Ms. Urena states that her condition does not allow her to go grocery shopping by herself. Pl. Decl. at 2. However, the ALJ repeatedly noted that Ms. Urena required assistance to go grocery shopping and accounted for this in her decision.

[10] The ALJ's decision also reflected that she considered the "paragraph C" criteria. R. 333. Paragraph C criteria are used to "evaluate mental disorders that are 'serious and persistent,'" such that there is a "medically documented history of the existence of the mental disorder in the listing category over a period of at least 2 years" and the evidence shows that the claimant's disorder satisfies both the C1 and C2 criteria. 20 C.F.R. pt. 404, subpt P., app. 1 § 12.00(G). To satisfy the C1 criteria, the evidence must show that the claimant "rel[ies], on an ongoing basis,

C. The ALJ Properly Determined Ms. Urena's Mental Residual Functional Capacity

At step four of the five-step inquiry, the ALJ considered whether despite Ms. Urena's severe impairments, she had the RFC to perform past work. The ALJ concluded that Ms. Urena "is unable to perform any past relevant work," but noted that "[a] specific finding as to the claimant's ability to perform her past relevant work is not necessary" because "all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given [Ms. Urena's] age, education, and residual functional capacity." R. 336. The ALJ concluded that Ms. Urena had "the residual functional capacity:

> to perform less than the full range of work at all exertional levels but with the following non-exertional limitations: she can perform simple, routine, one to two step tasks. She can tolerate occasional contact with coworkers and supervisors, but no direct work-related contact with the public. She can work around others, but not on teams or in collaboration with others. She can make simple decisions and adapt to occasional changes in essential work tasks.

R. 333.

1.    The ALJ Properly Applied the Treating Source Rule in Discounting the Opinions of Ms. Urena's Treating Clinicians

The ALJ could properly assign limited weight to the assessments of Ms. Urena's treating clinicians, G. Blass, M.D. and Beverly Punter-Knox, LCSW. See R. 335. In May 2013, Dr. Blass concluded that Ms. Urena's work ability estimate was "poor." R. 247. In a June 7, 2013, report to the U.S. Department of Housing and Urban Development ("HUD") concerning Ms.

_____

upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [his or her] mental disorder." § 12.00(G)(2)(b). To satisfy the C2 criteria, the evidence must show that "despite [the claimant's] diminished symptoms and signs, [he or she has] achieved only 'marginal adjustment,'" meaning that his or her "adaptation to the requirements of daily life is fragile," such that he or she has "minimal capacity to adapt to changes in [his or her] environment or to demands that are not already part of [his or her] daily life." § 12.00(G)(2)(c). Because there is no evidence in the record as to any of these criteria, the ALJ correctly observed that "the evidence fails to establish the presence of 'paragraph C' criteria." R. 333.

Urena's qualifications for housing, Ms. Punter-Knox concluded that Ms. Urena could not "work at this time," citing Ms. Urena's reports of "anxiety attacks in the context of increased stress" and her experiences of anxiety "in crowds on the train, in elevators [and] in [the] waiting room when at the clinic." R. 248-50.[11] The ALJ correctly noted that neither assessment "provide[s] a function-by-function assessment of the claimant's retained abilities," and that both were "conclusory." R. 335. Given their conclusory nature, neither opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In addition, the ALJ correctly noted that both opinions are contradicted by substantial evidence in the record, R. 335, and accordingly need not be given controlling weight, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Veino, 312 F.3d at 588. The ALJ pointed to substantial evidence in the record that contradicted the treating sources' conclusions, including Ms. Urena's own acknowledgment that she was able to work in quiet spaces, take buses when not crowded, cook, and perform housework. R. 352-57.

The ALJ also pointed to the opinions of two state agency consultative examiners, Dr. Kushner and Dr. Phillips, and an independent medical expert, Dr. Vitolo, which contradicted the opinions of the treating sources. R. 335. The ALJ noted that Dr. Kushner and Dr. Philips "both concluded that [Ms. Urena] would be able to perform simple and complex tasks, maintain a

_____

[11] The ALJ did not specifically cite Ms. Punter-Knox's January 2014 report to HUD, in which she stated that Ms. Urena could not work "at this time" due to her anxiety in crowded spaces. R. 295-98. However, this report was nearly identical to the report submitted to HUD in June 2013. Compare R. 248-50 with R. 295-98. Because the ALJ explained why she was discounting Ms. Punter-Knox's August 2013 opinion, it would be fruitless to remand to consider an essentially identical opinion. See Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (noting that while improper exclusion of evidence "ordinarily requires remand to the ALJ[,] . . . [w]here application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration") (third modification in original).

regular schedule, learn new tasks, and make appropriate decisions with only mild limitations in her ability to maintain attention/concentration." R. 335. The ALJ's observation is supported by the reports of Drs. Kushner and Phillips contained in the record. See R. 232-36 (Dr. Kushner's assessment), 492-500 (Dr. Phillips' assessment). Unlike the conclusions reached by Dr. Blass and Ms. Punter-Knox, the ALJ noted that the opinions of the state agency consultative examiners were not "conclusory" but rather were based on "essentially unremarkable mental status examinations . . . ." R. 335; see R. 234 (report of Dr. Kusnher, noting in mental status examination that Ms. Urena's "[d]emeanor and responsiveness to questions was cooperative" and her "[m]anner of relating, social skills, and overall presentation were adequate"); R. 493 (report of Dr. Phillips, noting in mental status examination, that Ms. Urena's "demeanor was cooperative and anxious" and her "manner of relating was adequate"). The ALJ also noted that Dr. Vitolo concluded, based on Ms. Urena's "retained activities of daily living, her positive response to treatment, and the generally unremarkable mental status examinations of record despite occasional episodes of increased symptoms associated with increased stress," that Ms. Urena had "no more than moderate work-related mental restrictions," and "would be able to engage in substantial gainful activity that involved simple repetitive tasks, one to two step commands, and occasional social contact." R. 335 (citing R. 725). Accordingly, the ALJ could properly accord greater weight to the opinions of Drs. Kushner, Phillips, and Vitolo, and their opinions, in combination with other evidence in the record, are substantial evidence supporting the ALJ's conclusion that Ms. Urena was not disabled given her age, education, and residual functional capacity.

        2. <u>The ALJ Properly Considered and Discounted Ms. Urena's Testimony</u>

## Regarding Her Ability to Work

In reaching her determination, the ALJ explicitly considered Ms. Urena's statements that she is unable to perform work-related activities on a sustained basis, and Ms. Urena's statements that she "experiences fears of hurting others that sometimes prevent her from leaving her home, as well as panic symptoms triggered by crowds and loud noises." R. 334. The ALJ recognized that "[t]he record . . . documents complaints of disturbed sleep, diminished appetite, dysphoric moods, concentration deficits, memory deficits, and frequent anxiety attacks triggered by crowds on trains, in elevators, and in waiting rooms." R. 334. Nonetheless, the ALJ concluded that while Ms. Urena's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." R. 334. As required, see Genier, 606 F.3d at 49, the ALJ pointed to inconsistencies between Ms. Urena's allegations regarding her ability to work and the evidence in the record, and pointed to several specific reasons for not giving deference to Ms. Urena's allegations. The ALJ noted that Ms. Urena acknowledged the ability to cook, perform housework, take public buses when not crowded, and shop with assistance. R. 334. In addition, the ALJ cited Ms. Urena's testimony that she was able to work as a housekeeper and a tax preparer when she was in a quiet environment. R. 334. Further, the ALJ noted that Ms. Urena did not initiate treatment until October 2011, over a year after the alleged onset date, and that her progress reports were indicative of only "moderate symptoms" between May 2012 and July 2012. R. 334. The ALJ also noted that Ms. Urena's symptoms were responsive to medication. R. 334. On the basis of this information in the record, the ALJ discounted Ms. Urena's statements regarding the "intensity, persistence, and limiting effects" of her symptoms. R. 334.

The record supports the ALJ's findings. For example, in November 2016, while Ms. Urena was taking Zoloft for "generalized anxiety disorder," she reported that anxiety was "not a problem." R. 734. In December 2015, she also reported that she did not feel nervous or anxious. R. 556, 562. Treatment records repeatedly reported that she was of "euthymic" (that is normal) mood. R. 205, 212, 214, 216, 221, 224-26, 228-30. In August 2012, Ms. Urena reported to Dr. Kushner that she "socialize[s]" and has a "good family relationship[] with her sister." R. 235. In October 2013, Ms. Urena reported to a social worker that she socialized with family and friends every day. R. 260. In April 2016, Ms. Urena reported to Dr. Phillips that she "socializes with family" and has good relationships with her family. R. 494. During the hearing, Ms. Urena testified that she attends appointments, performs household chores, cooks for her son, and spends time with her son on a daily basis. See R. 355. Ms. Urena also testified during the hearing that she was able to work as both a tax preparer and a housekeeper in a quiet environment where she was undisturbed. R. 355, 360-61.

In light of the above, the ALJ's decision was supported by substantial evidence[12]

IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 10) is granted. The Clerk is requested to enter judgment in favor of the Commissioner and to close the case.

---

[12] In her filing opposing the Commissioner's motion, Urena discusses her current condition. Pl. Decl. at 2. We do not consider these statements because they do not appear to relate to the time period in question — that is, from 2011 until the ALJ's decision in March 2017. Urena is free to make a new application for benefits if she believes she can show that she was disabled after March 2017.

Urena's filing also refers to "documentation" that may exist. Id. Because she does not identify this documentation, we do not address this statement further.

SO ORDERED.

Dated: May 15, 2019
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

Dermy L. Urena
3100 Decatur Avenue
Apt. 1A
Bronx, NY 10467